# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3141
_____

National Union Fire Insurance Company of Pittsburgh

*Plaintiff - Appellant*

v.

Cargill, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 20, 2022
Filed: March 7, 2023

_____

Before KELLY, WOLLMAN, and KOBES, Circuit Judges.

_____

KELLY, Circuit Judge.

     National Union Fire Insurance Co. of Pittsburgh (National Union) filed suit to obtain a declaration that it owed no payment to Cargill, Inc. under the employee theft clause of the insurance policy held by Cargill. Cargill counterclaimed for breach of

contract. The district court[1] granted judgment on the pleadings for Cargill, ruling that Cargill had suffered a covered loss resulting directly from an employee's theft. National Union appeals, and we affirm.

I.

Cargill purchased a commercial crime insurance policy through National Union. As is relevant here, the policy covered "employee theft."

Diane Backis was a Cargill employee for several decades at a grain facility Cargill operated in Albany, New York. The facility stored grain that Cargill, as part of its grain-sales business, purchased in the Midwest and transported to Albany by railcar. Backis worked at the Albany facility as a "Merchant/Admin Leader." Her responsibilities included negotiating sales contracts with local Albany grain customers,[2] entering sales into the accounting system, communicating with Cargill on what grain was needed to fulfill the sales commitments, and handling all accounts and invoices for these transactions. Given Backis's experience, she understood Cargill's financial systems and had control over the Albany facility's financial records.

Around 2008, Backis began a fraudulent scheme, at least in part to embezzle money from Cargill. She misrepresented to Cargill the price at which she could sell grain for in the Albany market; directly communicated these inflated prices to Cargill and entered false sales contracts into Cargill's accounting system; and manipulated the receivable balances, customer payments, and inventory records to reflect these sales. Believing that the grain would be sold at the inflated price, Cargill shipped additional grain to Albany. Backis then sold the grain at prices below those

---

[1]The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota.

[2]Specifically, the two types of grain that Backis handled were corn and sorghum. We use "grain" as a shorthand for corn and sorghum in this opinion.

reflected in Cargill's accounting system. Although Cargill had checks in place, including audit procedures and internal controls, Backis knew how to circumvent them. Cargill did not discover Backis's scheme until February 2016.

Upon discovering Backis's scheme, Cargill notified law enforcement. Cargill also sent a "notification of a claim" letter to National Union in April 2016, as required by its insurance policy, alerting National Union that law enforcement was investigating a "potential fraud/embezzlement" by one of its employees. Law enforcement monitored Backis for several months and arrested her in June 2016. Cargill fired Backis immediately thereafter. By then, Backis had diverted about $3 million from Cargill into her personal bank accounts. Backis later pleaded guilty, admitting in her plea agreement that she had embezzled over $3 million from Cargill and that the intended amount of loss was at least $25 million.

In August 2016, Cargill invoked a provision of its insurance policy (the investigative settlement clause) that allowed the insured and insurer to jointly appoint an investigator to "investigate the facts and determine the quantum of loss" being claimed. The investigative settlement clause stated that the report issued by the investigator "will be definitive as respects the facts and the quantum of loss." National Union and Cargill hired BDO Advisory to conduct the investigation into Cargill's claim for the loss caused by Backis's scheme.

BDO Advisory investigated Cargill's claim for two-and-a-half years. While drafting its report, BDO Advisory invited comment and input from both parties. BDO Advisory issued its final report (the Report) on May 28, 2019.

The Report made findings about Backis's "scheme . . . selling [grain] below Cargill's cost and manipulating Cargill's financial records to conceal her actions." It found that Backis's misrepresentations induced Cargill into shipping grain to Albany "under the pretense[] that [it] would be sold at a significantly higher price." Backis was successful in her scheme because she "controlled the pricing and recordkeeping elements of the sale" of grain. The Report concluded that had it not

been for Backis's misrepresentations, Cargill would have sent "minimal" grain to Albany. This conclusion was supported by the fact that after Backis was fired, new sales of grain in Albany "declined significantly"—indeed, by "approximately 90%"—and Cargill exited the Albany grain market altogether in 2018.

The Report calculated that "Cargill incurred losses of $32,115,192 as a result of Ms. Backis misrepresenting the price of corn and sorghum" to Cargill. The roughly $32 million figure did not include any lost profits, and the amount consisted primarily of the freight costs Cargill paid to ship grain to Albany. The amount of loss also included the $3 million that Backis had diverted to her personal bank accounts.

After BDO Advisory submitted its finalized Report to the parties, National Union notified Cargill of its position that the insurance policy covered only the $3 million that Backis embezzled and not the remaining $29 million of the total loss tabulated by the Report. National Union then filed suit to obtain a declaration in its favor, and Cargill counterclaimed for breach of contract. National Union filed an answer to the counterclaim, in which it reserved the "right to assert any and all" affirmative defenses. Cargill moved for judgment on the pleadings, which the district court granted after concluding that the entire $32 million calculated by the Report was covered by the insurance policy.[3] National Union appeals, arguing that there are factual disputes precluding judgment on the pleadings and that Backis's conduct did not fall within the policy's employee theft clause. It also contends that the April 2016 claim notification letter sent by Cargill did not constitute a formal request for payment sufficient to trigger prejudgment interest.

---

[3]National Union contends that the district court impermissibly relied on Backis's plea agreement, in which she agreed that the intended loss for sentencing purposes was at least $25 million, when assessing the amount of loss covered by the insurance policy. Although the district court did mention Backis's plea agreement in its order, it explicitly relied on the amount of loss "definitively" calculated by the Report.

-4-

Appellate Case: 21-3141   Page: 4   Date Filed: 03/07/2023 Entry ID: 5252211

II.

We review de novo a judgment on the pleadings under Federal Rule of Civil Procedure 12(c), applying the same standard that we use to address a motion to dismiss under Rule 12(b)(6). Ashley Cnty. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009). "Judgment on the pleadings is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." Id. (quoting Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006)). We "accept as true all facts pled by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party." Potthoff v. Morin, 245 F.3d 710, 715 (8th Cir. 2001). Here, the parties do not dispute that the factual findings in the Report are incorporated into the pleadings. See Williams v. Emps. Mut. Cas. Co., 845 F.3d 891, 903 (8th Cir. 2017) ("[C]ourts may consider matters incorporated by reference or integral to the claim." (cleaned up)).

A.

National Union first argues that several material facts are in "dispute" such that judgment on the pleadings was improper. See Ashley Cnty., 552 F.3d at 665 (disputes as to material facts preclude judgment on the pleadings). But many of the purportedly disputed facts it cites—including that Cargill would have sent the grain to Albany regardless of Backis's misrepresentations, that Cargill discovered its losses earlier than it said it did, and that Cargill knew of prior bad acts by Backis such that Cargill's claim was excluded from coverage—are contradicted by the findings of the Report, which National Union acknowledges are definitive and binding.[4] Similarly, many of National Union's allegedly disputed facts are not facts at all: whether Backis's conduct was a "theft," "stealing," or "taking," for instance,

---

[4]National Union also raises arguments invoking different provisions of the insurance policy, but we view them as challenging the Report's definitive factual findings from a different angle. As such, these arguments are precluded by the Report.

-5-

Appellate Case: 21-3141     Page: 5     Date Filed: 03/07/2023 Entry ID: 5252211

is a legal question, not a factual dispute. See infra. National Union cannot defeat judgment on the pleadings by recasting legal disputes as factual ones.

National Union also points to several "discoverable" facts that it believes are material to the outcome of its case. However, mere speculation that certain facts might be established through discovery—when those facts are not alleged or reasonably inferable from the pleadings—will not save National Union from judgment on the pleadings. See Ashley Cnty., 552 F.3d at 663 n.3 ("These allegations were not included in the complaint, by which we are constrained in reviewing this dismissal on the pleadings."). The absence of any such allegations here defeats National Union's request to proceed to discovery.[5] See Mickelson v. Cnty. of Ramsey, 823 F.3d 918, 923 (8th Cir. 2016) ("To survive a motion for judgment on the pleadings, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (cleaned up)).

Likewise, we are not persuaded by National Union's argument that disputed factual issues remain simply because it "reserve[d] [the] right to assert any and all other defenses" in its answer. Even after construing the pleadings in National Union's favor, they contain insufficient factual allegations to support the "other defenses" National Union suggests on appeal. Its generic reservation of the right to assert affirmative defenses does not save its suit from judgment on the pleadings. See Mick v. Raines, 883 F.3d 1075, 1079 (8th Cir. 2018) ("Threadbare recitals . . . supported by mere conclusory statements are not sufficient to survive a motion to dismiss." (cleaned up)).

The district court did not err by concluding there were no disputes as to any material facts that precluded granting Cargill's Rule 12(c) motion.

---

[5] Further, we are not convinced that the facts National Union seeks to discover are actually material. For instance, it seeks discovery to understand Backis's motive for making misrepresentations to Cargill, but it fails to articulate how evidence of Backis's intentions would alter our interpretation of the insurance policy.

Appellate Case: 21-3141   Page: 6   Date Filed: 03/07/2023 Entry ID: 5252211

B.

National Union next challenges the district court's legal conclusion that Backis's conduct fell within the terms of the insurance policy such that it covers Cargill's $29 million loss in freight costs.[6]  In this diversity case, Minnesota law governs our analysis of the insurance policy's terms. Jerry's Enters., Inc. v. U.S. Specialty Ins. Co., 845 F.3d 883, 887 (8th Cir. 2017).  We are bound by the decisions of the Minnesota Supreme Court, and if that court has not spoken on a particular issue, we "may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data." C.S. McCrossan Inc. v. Fed. Ins. Co., 932 F.3d 1142, 1145 (8th Cir. 2019) (cleaned up) (quoting Integrity Floorcovering, Inc. v. Broan-Nutone, LLC, 521 F.3d 914, 917 (8th Cir. 2008)).

Under Minnesota law, an insurance policy must be interpreted under "the general rules of contract law, giving terms their plain and ordinary meaning to honor the intent of the parties." Econ. Premier Assur. Co. v. W. Nat'l Mut. Ins. Co., 839 N.W.2d 749, 752 (Minn. Ct. App. 2013); see also Midwest Fam. Mut. Ins. Co. v. Wolters, 831 N.W.2d 628, 636 (Minn. 2013).  The burden of proving coverage rests with the insured party. Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co., 825 N.W.2d 695, 705 (Minn. 2013).

Cargill's insurance policy provided coverage for employee "theft," which was defined in the policy as "the unlawful taking of property to the deprivation of the Insured."  Additionally, the insured's loss must have resulted "directly from" employee theft to be covered by the policy.

"Taking" is not defined in the policy, but both parties rely on the same definition: "[t]he act of seizing an article, with or without removing it, but with an implicit transfer of possession or control." Taking, Black's Law Dictionary (11th

---

[6]National Union does not dispute that the $3 million Backis diverted into her personal bank accounts is covered by the insurance policy.

-7-

Appellate Case: 21-3141     Page: 7     Date Filed: 03/07/2023 Entry ID: 5252211

ed. 2019). Raising several arguments about how Backis's control over the grain sales was not a "taking" of the grain, National Union contends that her fraudulent conduct did not amount to a theft.[7] We disagree. Backis took implicit control over the grain such that her conduct constituted an unlawful taking. She exercised her authority to direct the transfer and sale of the grain. See Sherwin-Williams Co. v. Beazley Ins. Co., No. 18-02964, 2020 WL 4226866, at *4 (D. Minn. July 23, 2020) (concluding that a reasonable jury could find that an employee's control over its employer's invoice approvals amounted to employee theft). She also lied to Cargill and manipulated its financial records to induce the company to ship its grain to Albany. See Cumulus Invs., LLC v. Hiscox, Inc., 520 F. Supp. 3d 1141, 1151 (D. Minn. 2021) (concluding that employees' lies, falsification of documents, and manipulation of financial data constituted an "unlawful taking" of the investors' money). It is true that Backis never physically seized the grain, but a "taking" includes the "implicit transfer" of control, and National Union concedes that under this definition, a physical seizure was not necessary. As found by the Report, Backis "controlled the pricing and recordkeeping elements of the sale" of the grain, and if not for Backis's misrepresentations, Cargill would have sent only a minimal amount of grain to Albany. This exercise of control amounted to an unlawful taking under the insurance policy.[8]

---

[7]National Union also points out that the Report stated that "the corn and sorghum *was not stolen* or damaged," suggesting the Report found that Backis's actions did not constitute theft. But the Report did not interpret the terms of the insurance policy or make any coverage determinations. We read the Report as simply finding that Backis did not physically take the grain itself.

[8]National Union also asserts that Cargill's loss fell outside the scope of coverage because Backis's scheme benefitted the recipients of the freight costs paid by Cargill rather than her directly. That the recipients of the freight payments benefitted may mean that Backis caused injury to Cargill that was disproportionate to the benefits she received, but the insurance policy covers Cargill's loss, not Backis's gain.

-8-

Appellate Case: 21-3141     Page: 8     Date Filed: 03/07/2023 Entry ID: 5252211

National Union also argues that Cargill's loss of $29 million in freight costs did not result "directly from" Backis's conduct. The insurance policy does not define what constitutes a loss resulting "directly from" theft. Again, both parties rely on Black's Law Dictionary, which defines "directly" as "[i]n a straightforward manner," "[i]n a straight line or course," or "[i]mmediately."

The Report definitively concluded that Cargill would not have paid approximately $29 million in freight costs if not for Backis's scheme, and it found no other intervening cause that could account for that loss. And once Cargill fired Backis, shipments to Albany were largely discontinued, and Cargill soon exited the Albany market entirely. National Union asserts that Cargill's decision to ship the grain was an intervening step that broke the causal chain. But Backis's scheme was designed to induce Cargill into making that very decision, and the scheme's success in achieving its goal did not disrupt the causal link.[9] Therefore, Backis's conduct, which undisputedly induced Cargill to ship grain to Albany, directly caused Cargill's $29 million loss. See Avon State Bank v. BancInsure, Inc., 787 F.3d 952, 958 (8th Cir. 2015) ("The loss to [the employer] from [an employee]'s fraudulent conduct is a direct loss because [the employee] acted fraudulently to benefit himself by protecting his interest and did so through acts which would necessarily make [the employer] liable to third parties . . . .").

Cargill has shown that Backis's conduct constituted an employee theft under the insurance policy and that Cargill's loss directly resulted from Backis's theft. The district court properly granted Cargill's motion for judgment on the pleadings.

---

[9]None of the cases cited by National Union support its claim that Cargill's losses were not a "direct" result of Backis's conduct. E.g., Direct Mortg. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburg, 625 F. Supp. 2d 1171, 1177-78 (D. Utah 2008) (addressing losses sustained first by *third parties*, which were then passed onto the insured).

## III.

Finally, National Union contends that the district court erred by calculating prejudgment interest beginning on the date Cargill sent its notice letter to National Union. According to National Union, the district court should have instead used the date the Report was finalized because the Report contained the amount of loss calculated by BDO Advisory. Prejudgment interest is governed by state law, Schwan's Sales Enters., Inc. v. SIG Pack, Inc., 476 F.3d 594, 595 (8th Cir. 2007), and we review de novo interpretations of state laws such as Minnesota's prejudgment interest statute. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 917 (8th Cir. 2005).

Minnesota's prejudgment interest statute provides that an insured who prevails on a claim against an insurer based on the insurer's failure to make payments is entitled to recover interest on money due under the policy "calculated from the date the request for payment of those benefits was made to the insurer." Minn. Stat. § 60A.0811, subd. 2(a). Prejudgment interest serves not only to compensate for loss of use of the money due under the policy but also "to promote settlements." Arcadia Dev. Corp. v. Cnty. of Hennepin, 528 N.W.2d 857, 861 (Minn. 1995); see also Owatonna Clinic-Mayo Health Sys. v. Med. Protective Co. of Fort Wayne, Ind., 714 F. Supp. 2d. 966, 971 (D. Minn. 2010). Awarding interest from the date the insured requests payment "creates an incentive for a commercial insurer to resolve insurance coverage disputes quickly." Owatonna Clinic-Mayo Health, 714 F. Supp. 2d at 971.

The district court determined that Cargill's April 2016 letter was a "request for payment" that triggered the prejudgment interest clock. Cargill's letter twice stated that it was a "formal notification" of Cargill's claim under the insurance policy. The letter explained to National Union that a Cargill employee was being investigated by law enforcement for "potential fraud/embezzlement" and apologized for being "short on specifics" given the nature of the "ongoing criminal investigation." It concluded by saying that Cargill would "provide additional details on the matter" as soon as possible.

-10-

This letter was sufficient to alert National Union that Cargill was seeking insurance coverage. Although the letter did not contain a specific monetary amount requested, Minnesota's prejudgment interest statute contains no requirement that the amount of loss be included in an insured's request for payment in order to begin the interest clock. See Minn. Stat. § 60A.0811, subd. 2(a); Amplatz v. Country Mut. Ins. Co., No. 12-1758, 2015 WL 1729518, at *2 (D. Minn. Apr. 15, 2015) (rejecting insurer's argument that prejudgment interest statute was not triggered until the insured submitted repair cost estimates). Further, in August 2016, a few months after sending the letter, Cargill invoked the investigative settlement clause of the policy. National Union worked with Cargill to hire an investigator to assess Cargill's claim. National Union's response and participation in the investigative settlement process thus indicates that it understood in 2016 that Cargill was making a claim under the policy—not two-and-a-half years later when the investigation ended and the Report was issued. We conclude that the date of Cargill's notice letter was the appropriate date to begin calculating prejudgment interest.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____